**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

**ELIJAH SIMS and JAUTASSA SIMS,**                                        **PLAINTIFFS**

**VERSUS**                                        **CIVIL ACTION NO: 2:07-cv-036-P-A**

**UNITED STATES OF AMERICA**                                        **DEFENDANT**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter comes before the court after a bench trial conducted from January 25 to January 26, 2010. After due consideration of the evidence, arguments, and proposed findings of fact and conclusions of law presented by the parties, the court is prepared to rule.

**A. FINDINGS OF FACT**

On March 6, 2007 the plaintiff filed the instant case against the VA Medical Center ("VAMC") in Memphis, Tennessee alleging medical malpractice pursuant to the Federal Tort Claims Act.

During his nine-week stay at the VAMC beginning on December 26, 2004 and ending on March 2, 2005, Mr. Elijah Sims was 57 years old. During trial of this matter in January 2010, Mr. Sims was 62 years old. It is agreed that he has a life expectancy of 16.9 years. Mr. Sims is married to Jautassa Sims and they have two children, one of whom is approximately 28 years old, the other approximately 18 years old.

Mr. Sims served in the United States Army for two years and six months – one year of which he spent in Germany and the remainder he spent in Vietnam as a combat engineer. Mr. Sims was honorably discharged.

In 2003 the VAMC diagnosed Mr. Sims with rheumatoid arthritis. He receives Social

Security Disability benefits and a retirement pension from the Mississippi National Guard.

On December 26, 2004 Mr. Sims went to the emergency room at the VAMC in Memphis, Tennessee. His primary complaints were sore hands, wrists, ankles, and shoulders as well as lower-back pain. Exhibit 1, p. VAMC – 00002764. The VAMC's main concern at admission was of a pulmonary and liver nature secondary to methotrexate toxicity. Exhibit 1, p. VAMC – 00002766, VAMC – 00002751. The VAMC admitted Mr. Sims with a diagnosis of active rheumatoid arthritis ("RA") and with methotrexate toxicity due to a medication prescribed for RA by the VAMC. Mr. Sims also complained of dyspnea and the VAMC was concerned about the pulmonary effects of the RA medication.

The hospital records between December 29-30, 2004 indicate that Mr. Sims felt better compared to admission. Exhibit 1, p. VAMC – 00002733, VAMC – 00002734.

On December 30, 2004 and January 3, 2005, the hospital records stated that Mr. Sims was neurologically "grossly intact." Exhibit 1, VAMC – 00002718, VAMC – 00002709.

During his stay at the VAMC, Mr. Sims developed pneumonia. Furthermore, one of his central lines became infected which lead to active systemic sepsis.

Over a period of several days after his admission on December 26, 2004, the VAMC documented that Mr. Sims's saturation was declining and his respiration was becoming compromised. In other words, he was having serious problems breathing. The VAMC documented on January 3, 2005 that he would require intubation given his respiratory difficulties and decreasing saturation. Specifically, the VAMC noted that "possible intubation was on the horizon." Exhibit 1, VAMC – 00002700.

According to *Stedman's Medical Dictionary* (28th Edition), intubation is defined as:

"Insertion of a tubular device into a canal, hollow organ, or cavity; specifically, passage of an orotracheal or nasotracheal tube for anesthesia or for control of pulmonary ventilation." In this case, multiple attempts at orotracheal, or endotracheal, intubation are at issue for the purpose of controlling Mr. Sims's "pulmonary ventilation" or ability to effectively breathe.

After Mr. Sims's ability to effectively breathe continued to decline, the VAMC made multiple attempts to intubate him on January 3, 2005 before being transferred to the Intensive Care Unit. Exhibit 1, VAMC – 00002699. More specifically, the records state: "Several attempts made at intubation w/ severe desaturation during each. ETT filled w/ copious amounts yellow sputum." *Id.*

Important information is missing from the hospital records regarding the multiple intubation attempts. There is no mention who performed the intubations. There is no mention of an anesthesia consult, nor of the use of fiberoptics. Nor is there mention of exactly how many attempts at intubation were made; rather, the records use the term "several attempts." It is undisputed that the intubation was done on an emergent basis without an anethesiological consult.

After the inubation, the VAMC transferred Mr. Sims to ICU where he remained until January 8, 2005 whereupon he was returned to the Medical Service.

For the first time in late January 2005 the VAMC obtained a neurosurgical consultation from Dr. Daniel Kueter, a VAMC physician in training. Dr. Kueter ordered imaging studies at the VAMC. On January 29, 2005 the VAMC noted that Mr. Sims had paresis and cervical spine abnormalities, including 1 cm subluxation of the C1-C2 vertebrae. Spinal cord edema was noted on January 31, 2005. By February 2, 2005 Mr. Sims had increased neck spasms and cord symptoms and the VAMC noted that there was a need for spinal cord decompression.

On February 28, 2005 the VAMC noted further deterioration and advised a decompression fusion. Mr. Sims underwent surgical resection of the odontoid at C1-C2.

The plaintiff offered four physician experts for live testimony during trial: Dr. Robert J. Adams, an expert in neurology; Dr. E.F. Klein Jr., an expert in anesthesiology and intensive care; Dr. Jeffrey A. Green, an expert in anesthesiology and intubation; and Dr. Donald H. Marks, an expert in intubation. These physicians opined that the proximate causes of Mr. Sims' myelopathy (spinal cord injury) and subsequent permanent injuries were: (1) the failure of the VAMC to acquire a radiological study and/or an anesthesiology consult before the intubation; (2) the failure to stabilize Mr. Sims's neck for the procedure; (3) the failure to utilize less traumatic intubation procedures, such as the fiber optics used by the anesthesiologist at Methodist during Mr. Sims's eventual cervical fusion surgery; (4) the failure to perform the intubation by someone who was highly skilled in intubating Rheumatoid Athritis patients who are particularly vulnerable in the C1-C2 region of the neck, as opposed to a pulmonary fellow or junior resident; (5) the failure to adequately document the multiple attempts at intubation – such as not noting who performed the intubation, how many attempts it took, or how traumatic the process was – which in turn failed to provide important information to care givers formulating future treatment strategies.

These experts testified that to a reasonable degree of medical certainty, the aforementioned failures by the VAMC were breaches of the standard of care which proximately caused and/or contributed to the plaintiff's permanent injuries.

Drs. Adams and Marks opined that contrary to the VAMC's belief that the spinal cord injury was caused by a pannus of infection in the C1-C2 area, the spinal cord injury was caused by the unnecessary amount of force applied during the multiple intubation attempts which forced the

4

odontoid process to press hard enough to rupture the transverse ligament which normally prevents the hard, boney odontoid process from pressing upon the spinal cord. The plaintiff's experts opined that the pannus could not have caused the spinal cord injury given that a pannus is soft and not boney; furthermore, the rupturing of the transverse ligament in and of itself shows that too much force was applied during the multiple intubation attempts. They also opined that the explanation for why it took three weeks after the January 3, 2005 intubation for the spinal cord injury to progress is that when the transverse ligament ruptured and the odontoid was allowed to move about too freely, the movement of Mr. Sims's neck (which should have been stabilized) eventually made the injury worse – akin to walking around on a broken leg.

The Government offered expert testimony via deposition from three physicians: Dr. Daniel Kueter, a VAMC resident at the time who treated Mr. Sims; Dr. John H. Robertson, who performed the cervical fusion surgery on Mr. Sims at Methodist Hospital; and Dr. Ellsworth Jack Remson of the VAMC. It is undisputed that none of the defense experts considered the effect of the multiple attempts at intubation on January 3, 2005 in rendering their medical opinions.

Accordingly, the testimony by the plaintiff's four medical experts is unrebutted that the primary cause of the plaintiff's injuries was a combination of the failure to acquire a radiological study and/or anesthesiology consult before the intubation, the failure to have an appropriately skilled physician to perform the intubation given the particular vulnerability of a patient with RA, the multiple attempts at traumatic intubation without the proper expertise and alternative methods of intubation tailored for patients with vulnerable necks, the failure to secure the plaintiff's neck before and after the intubation, and the lack of proper medical documentation.

The court finds that given the defense experts' failure to address the multiple attempts at

intubation, the testimony of the plaintiff's four experts is more credible and the court hereby accepts that testimony as true. Accordingly, the court finds that the injuries sustained to the plaintiff beginning on January 3, 2005, and their progress to today, was proximately caused by the combination of factors discussed above involving the multiple attempts at intubation on January 3, 2005. The permanent results of Mr. Sims's stay at the VAMC include quadriparesis and other attendant neurological disabilities including the inability to ambulate without assistance, drive, cook, maintain his house and yard, and function sexually.

Before the subject hospitalization, it is undisputed that Mr. Sims was able to walk and drive, that he had no weakness in his upper extremities, and that he was able to function sexually. Though Mr. Sims had pain in his left knee, he was able to ambulate, maintain his house and yard, and cook. Mr. Sims now requires a walker to amublate short distances and a wheelchair for longer distances. He now has weakness in his upper extremities and is no longer able to function sexually, nor can he drive an automobile. His wife must care for him continually.

Mrs. Jautassa Sims testified that before the surgery, her husband was active and that he played sports and did a lot of chores around the house and yard. She testified that since he returned from the VAMC, he is no longer active. He can no longer go to football games and watch his son who plays in the school band. He can no longer help around the house or mow the yard. He can only walk without a walker for a short distance. He cannot drive. Mrs. Sims must aid her husband in dressing and bathing. She testified that she is the sole caregiver for her husband which is a twenty-four hour job. She testified that her husband can no longer engage in intercourse.

The court finds that the VAMC is liable for medical negligence.

## B. CONCLUSIONS OF LAW

This case involves a medical negligence claim under the Federal Tort Claims Act since the VAMC is a federal entity. Since the injuries occurred in Tennessee, the substantive law of that state applies.

To prevail on a medical malpractice claim in Tennessee, a plaintiff must present expert evidence(1) establishing the applicable standard of care; (2) demonstrating that the defendant's conduct fell below that standard of care; and (3) demonstrating that the defendant's conduct was the proximate cause of the injuries that would not have otherwise occurred. Tenn. Code Ann. § 29-26-115(a); *White v. Vanderbilt University*, 21 S.W.3d 215, 226 (Tenn. 1999).

The court concludes that the plaintiff has met these three elements.

Through the testimony of four expert witnesses, the plaintiff established by a preponderance of the evidence that the applicable standard of care for patients with Rheumatoid Arthritis (which makes the patient's neck particularly vulnerable) who develop severe breathing problems necessitating pulmonary ventilation via intubation requires (1)  a radiological study and/or anesthesiology consult; (2) stabilization of the neck before, during, and after the intubation; (3) performance of the intubation by a physician specifically skilled in intubating RA patients with vulnerable necks; (4) use of gentler methods of intubation such as fiber optics; (5) avoidance of multiple traumatic attempts at intubation; and (6) proper documentation of the intubation procedure both to record what happened and to alert care givers for future treatment.

The plaintiff's experts established by a preponderance of the evidence that the conduct of the VAMC with regard to the multiple attempts at intubation on January 3, 2005 and the continuing failures to be mindful of the plaintiff's vulnerable neck thereafter fell below aforementioned

standards of care.

The plaintiff also established by a preponderance of the evidence though his experts that the VAMC's breaches of the standard of care proximately caused the plaintiff's injuries flowing from the intubation and the failure to stabilize the plaintiff's neck before and after. These injuries include the pain and suffering experienced during the multiple attempts at intubation on January 3, 2005, the subsequent quadriparesis, myelopathy and the cervical fusion, as well as the consequent injuries of the substantially decreased ability to ambulate, perform yard and house work, bathe, dress, and engage in marital intercourse.

The Government is correct that the plaintiff is ineligible for lost wages or lost earning capacity given it is undisputed that Mr. Sims is already retired and was not engaged in gainful employment when admitted to the VAMC on December 26, 2004.

Furthermore, the Government is correct that the plaintiff did not submit sufficient evidence to recover for past or future medical expenses. Mrs. Sims testified that the only other person that could care for her husband would be their daughter to whom Mrs. Sims offered $150 per day. Though the plaintiff avers that the Government did not object to this amount during trial, the court notes that the Government's proposed findings and conclusions of law argues that there was no credible evidence of future medical expenses. Accordingly, the court construes this statement as an objection. In any event, the court finds that the plaintiff did not establish by a preponderance of the evidence a reasonably certain figure required for future medical expenses since the $150-per-day figure was conclusory.

It is undisputed that the plaintiff is eligible for damages arising from pain and suffering, loss of enjoyment of life. The plaintiff's wife, also a named plaintiff, is eligible for damages arising from

loss of consortium.

The Government argues pursuant to *Haws v. Bullock*, 592 S.W.2d 588 (Tenn. App. 1979) that damages awarded to the plaintiff, if any, should be discounted to reflect any injuries the plaintiff would have experienced today from his pre-existing conditions of MGUS (monoclonal gammopathy of undetermined significance) and RA (rheumatoid arthritis). The Court in *Haws* ruled that "the jury must, if possible, apportion the amount of disability and pain between that caused by the pre-existing condition and that caused by the accident." *Id.* at 591. However, the Court also recognized that "[w]here the tort feasor's negligence has rendered it impossible to apportion the amount of disability caused by the pre-existing condition and that caused by the subsequent injury, it is generally held that the defendant is liable for the total damages for the injuries whether the injuries were for new ones or aggravation of a pre-existing condition." *Id.*

The court concludes that it has submitted insufficient evidence for the court to reasonably distinguish what injuries are attributed solely to Mr. Sims's pre-admission maladies. Since the defendant's experts failed to take into account the multiple attempts at intubation in rendering their opinions on the plaintiff's injuries, it is not reasonably possible for the court to accurately discount the plaintiff's damages by pre-existing injuries. In any event, it remains undisputed that Mr. Sims could ambulate and function at a level significantly higher before the subject admission to the VAMC.

## C. DAMAGES

The court concludes that Plaintiff Elijah Sims is entitled to the following damages arising from the medical negligence of the VAMC:

From the date of the intubation until the end of Mr. Sims's life expectancy of 16.9 years:

Pain and suffering = $250,000.00

Loss of enjoyment of life = $850,000.00

The court concludes that Plaintiff Jautassa Sims is entitled to the following damages arising from the medical negligence of the VAMC upon her husband:

From the date of the intubation until the end of Mr. Sims's life expectancy of 16.9 years:

Loss of consortium:    $ 425,000.00

Accordingly, a final judgment shall issue forthwith,

**THIS DAY** of March 26, 2010.


/s/ W. Allen Pepper, Jr.
W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE